# VENATOR, *Respondent,*
## *v.*
# QUIER, et al, *Appellants.*
## (TC 6959, SC 25590)

589 P2d 731

Thomas C. Howser, of Cottle, Howser & Hampton, Ashland, argued the cause and filed the briefs for appellants.

William D. Cramer, Burns, argued the cause and filed the brief for respondent.

TONGUE, J.

■■■■■■■■■■■■■■■■

Lent, J., concurring in part; dissenting in part.

## TONGUE, J.

This is a suit to quiet title based upon allegations of title by adverse possession and constructive trust. Plaintiff is the mother of the defendant. Upon the death of her husband (defendant's adoptive father) without a will, she became the administratrix of his estate. Before his death plaintiff and her husband had for many years operated a large cattle ranch in Harney and Malheur Counties. The original ranch consisted of lands previously owned by her husband and his brother as tenants in common, as to which his brother had conveyed his interest to plaintiff's husband and to plaintiff, as husband and wife. The ranch also included other lands held in the name of plaintiff and her husband as tenants by the entirety acquired during the operation of the ranch, as well as lands held in the individual name of her husband and also acquired during the operation of the ranch. The lands in controversy include all but 160 acres of the lands held in the name of plaintiff's husband as an individual and also the interest of plaintiff's husband in the original ranch lands.

Plaintiff's complaint alleged that she had been in possession of the lands in controversy under a parol gift from her husband since 1950 as a tenant by the entirety with her husband and that after his death in 1964 she had been in sole and exclusive possession of such lands for a period of more than ten years (including two years during which she was administratrix of his estate) at the time of the filing of her complaint in this case in 1975.

Plaintiff also alleges, as a separate cause of suit, that she contributed equally with her husband to the purchase of all lands acquired after 1939; that her husband had represented and agreed to put the title to such lands in their joint names and that his failure to do so would result in an unjust enrichment of the defendant.

[21]

The trial court held that plaintiff was entitled to prevail, both by adverse possession and upon the application of a constructive trust. In appealing from that decree defendant contends that while plaintiff was administratrix of her husband's estate she could not adversely possess land which should have been included as a part of that estate and that the facts of this case do not satisfy the requirements for a constructive trust, as alleged by plaintiff.

*The facts.*

Plaintiff married her now deceased husband, Mr. Venator, in 1939. She had been previously married. Defendant, the child of that marriage, was then five years of age. He was subsequently adopted by plaintiff's husband.

In 1936 Mr. Venator and his brother acquired from their parents a ranch in Harney County and operated it as Venator Brothers, a partnership, with title held in their two names as tenants in common. In 1942 plaintiff and her husband bought out his brother's interest in that ranch under a contract for monthly payments, but with no down payment. Mr. Venator and his wife, the plaintiff, continued to operate the ranch. In 1950 Mr. Venator's brother conveyed title to his interest in that original ranch by deeds naming as grantees Mr. Venator and plaintiff as husband and wife.

Plaintiff worked with her husband not only as a housewife, but in the performance of the work of operating the ranch, including work in the hay fields and in keeping the ranch records, among other things. In later years, when he became ill, she performed most of the work in the operation of the ranch. Although there was no formal partnership agreement, they considered themselves to be partners. They also borrowed money as a partnership from Northwest Livestock Production Credit Association (NWLPCA) and it loaned funds to them as a partnership, according to the

testimony of its field man, although the loan applications signed by them both did not use the word "partners."

Between 1942 and 1951 six additional tracts of lands in Harney County were acquired. The titles to three of these tracts of land was taken by deeds naming plaintiff and her husband, Francis Venator, as grantees. Title to three of the tracts, however, was taken by deeds naming Francis Venator as the sole grantee. At some later date an additional tract of 160 acres in Malheur County was acquired, again by deed naming Francis Venator as sole grantee. According to plaintiff, this was done to let defendant "have that much of it." When asked if she had any "understanding or agreement" with Mr. Venator "about the acquisition of land," plaintiff testified that:

> "Well, I just thought when he bought a piece of land that my money went into it, too, as well as his so it would be in both of our names. Some he bought and put in both of our names and some he bought and put in his name. Whether it was an oversight or what, I'm not sure."

and that:

> "Well, he just said that if I die before you do, it's yours, and if you die before I do, why it's mine. And that's about all the agreement we had."

Plaintiff also testified that Mr. Venator said several times that he didn't believe in wills, but that "what I have goes to you if I die first" and that "it all goes to you." Two other witnesses also testified to hearing Mr. Venator say that he "didn't believe in wills" or "didn't have to make out a will" because his wife would "get it anyway" or that if something happened to either him or his wife, the survivor would "get the ranch." There was testimony, however, that Mr. Venator was a good businessman; that he had on occasion consulted an

attorney; that he kept the deeds at his home and understood what deeds were; that he talked about making a will, but never did so, and that in 1960 he was unhappy and once discussed the possibility of a divorce.

Plaintiff also testified that in 1950, after receiving some tax statements addressed to both plaintiff and her husband and some to him alone, she and Mr. Venator went to the Harney County Courthouse "to put the titles in both of our names," after which all tax statements came addressed to both of them. It appears, however, that no deeds were executed at that time and that no change was made in the record titles.

Meanwhile, in 1959, defendant had a fight with Mr. Venator after Mr. Venator, who objected to defendant's impending marriage, came home intoxicated. At that time defendant, then 24 years of age, was working on the ranch. He then left, married, and secured employment elsewhere. Defendant testified that he and Mr. Venator later "shook hands" and "forgot about it"; that he continued to visit the ranch and help out in branding, among other things, and continued to have good relations with his father. Defendant, however, later changed his name to that of his natural father and there was testimony that after his marriage his relations with Mr. Venator were never "the same," although there was "no animosity."

Defendant testified he and Mr. Venator never discussed defendant's receiving any property, but that Mr. Venator never stated an intention to disinherit him. Plaintiff testified, however, that Mr. Venator said he did not want defendant to "have any part of it" because defendant was not his son and that he wanted everything to go to her.

In 1963 plaintiff's mother died. She then inherited $37,450 in cash, plus cattle worth $11,450 and the proceeds from the sale of land, payable over a term of

years. Plaintiff testified that the $37,450 was expended in payments for property previously purchased, but not paid for. On cross-examination, however, she admitted that all of such lands had been purchased and paid for before she inherited that money, with the possible exception of a Federal Land Bank loan on one tract that was paid off with her money. Apparently, however, the balance of that money was used in the ranching operations.

In 1964 Mr. Venator died intestate. Plaintiff testified that she then told William Cramer, attorney for the estate, that he could get a copy of a title report from the Federal Land Bank which would list the property owned by her and Mr. Venator. That title report, dated in 1961, showed that all of the ranch property was owned by her and Mr. Venator, as husband and wife, except for the 160 acres in Malhuer County, which was not included in that report. A Metsker map also showed the ranch to be owned by "F. and H. Venator" (Frances and Henrietta Venator). Accordingly, only the 160-acre tract was listed in the inventory as an asset of the estate. The inventory also listed as an asset of the estate the interest of the decedent in partnership assets, including cattle and equipment. Further borrowing from NWLPCA was authorized as "reasonable and necessary to the continued operation of the partnership property." In 1966 the estate was closed, after payment to defendant as Mr. Venator's heir for the interest of Mr. Venator in the personal property of the partnership.

Upon the death of Mr. Venator plaintiff continued to operate the ranch as her own, assumed all of the resulting obligations, including payment of taxes on the land, and claimed ownership of it. Defendant admitted knowing shortly after the death of Mr. Venator that his mother claimed ownership of all but the 160 acre tract, which he then leased to her, and he did not then claim ownership of any other portion of the ranch.

[25]

In 1975, in connection with an application for a loan from the Federal Land Bank to purchase more land, a further title report was prepared. That title report revealed that although title to some of the ranch lands had been held by Mr. Venator and plaintiff as husband and wife, title to other ranch lands was held in the name of Mr. Venator alone.

Her attorney, Mr. Cramer, then asked defendant to come to his office. Defendant testified that Mr. Cramer first told him that there was some problem involving "a few acres" and asked him to sign a quitclaim deed; that on the afternoon of the same day he was told by Mr. Cramer that about 1,000 acres was involved, and that Mr. Cramer later offered to pay him $5,000 to sign the quitclaim deed, which he refused to do. Defendant admitted on examination by Mr. Cramer that "right from the start" of those conversations Mr. Cramer gave him a copy of the title report, which showed that more than 1,000 acres was involved. Mr. Cramer did not testify.

Defendant also testified that this occasion, in 1975, was the first time that he knew, or that anyone told him, that he might have been an heir to more than 160 acres of the ranch lands or that "there was any question about it." No evidence to the contrary was offered by plaintiff. There is no evidence, however, that plaintiff made any affirmative misrepresentations to defendant or that she intentionally concealed from him any facts known only to her.

Plaintiff then filed this suit to quiet title.

*Adverse possession since death of husband.*

In support of her claim of ownership by adverse possession of all of the ranch lands (except for 160 acres) from the date of Mr. Venator's death in 1964 until the filing of this suit in 1975, plaintiff must necessarily contend that the two-year period during which she was the administratrix of his estate is properly to be included in computing the period of 10

years during which she claimed to have held adverse possession of such lands. This is so, according to the plaintiff, because real property is "not automatically includible in an estate in Oregon" and is "not includible at all unless such inclusion appears necessary for payment of debts and expenses," with the result that "the real property was never an asset of the estate" and plaintiff did not "wrongfully omit the real property from the estate," but "had a right to claim it adversely as against the defendant" during that two-year period.

It may be, as contended by plaintiff, that under Oregon law as it existed in 1964 title to real property owned by one who died intestate descended directly to his heirs and, strictly speaking, was not an asset of the estate unless the personal property was insufficient for payment of the debts and expenses of administration.

Nevertheless, in 1964 ORS 116.105 provided:

> "*Possession and control of property.* The executor or administrator *is entitled to the possession and control of the property of the deceased, both real and personal,* and to receive the rents and profits thereof *until* the administration is completed or *the same is surrendered to the heirs or devisees by order of the court or judge thereof;* * * * During the time the property is in the possession or control of the executor or administrator, *it is his duty to keep the same in repair and preserve it* from loss or decay as far as possible."[1] (Emphasis added)

At the time of the administration of the estate in 1964 it was also provided by ORS 116.820 that

> "*All purchases of the property of the estate by an executor or administrator, however made, whether directly or indirectly,* are prohibited, and if made *are void,* except when made in compliance with another

---

[1] That statute was repealed in 1969, Or Laws, ch 591, § 305.

statute, or the will of the decedent, or a contract or other instrument, executed by the decedent."[2] (Emphasis added)

Plaintiff cites *Lombard v. Castor,* 36 Or 266, 59 P 473 (1899), and *First Nat. Bank v. Connolly,* 172 Or 434, 138 P2d 613, 143 P2d 243 (1943), as holding that an administrator of an estate may purchase from an heir an heir's portion of the assets of an estate, despite provisions of ORS 116.820. Those cases held that the statute applies only to sales made by an executor, administrator or other trustee to himself and that a sale by an heir or beneficiary under a will of his interest in the assets of an estate to the administrator or executor of the estate is not void under the statute and will not be set aside provided that the administrator or executor can sustain the burden of proving that the transaction was "fair" and that no advantage was taken by him of his position as administrator or executor. Both of those cases, however, involved claims by third parties seeking to set aside allegedly fraudulent transactions, rather than suits by heirs to set aside transactions between themselves and administrators or executors.

In *Wells et al v. Wood et al,* 125 Or 38, 263 P 54 (1928), this court considered the same statute, as well as its interpretation in *Lombard v. Castor, supra.* In *Wells* the defendant, while executrix under the will of her deceased husband and also trustee under that will for the benefit of decedent's children, induced them to accept $6,000 in full payment of legacies of $10,000 as provided under the will of their father. This court held that this transaction was void as against public policy without regard to the provisions of the statute. In so holding, this court noted (at 46) the following contention by the plaintiffs in that case:

"* * * [T]he general rule of law applicable to the purchase by a trustee of property from his *cestui que*

---

[2] That statute was repealed in 1969, Or Laws ch 591, § 305.

[28]

*trust* is, such dealings are scrutinized with jealous concern by courts of equity; that *such purchases must be fairly and openly made after all information possessed by the trustee has been communicated to the cestui que trust,* and the trustee is not guilty of any inequitable conduct." (Emphasis added)

In approving that contention this court said (at 47):

*"It is against public policy for an executor who is administering a solvent estate to purchase from the heirs of the legatees, at a discount, their interest in the estate* [citing cases]. An executor is not permitted to make a profit for himself directly or indirectly in the administration of his testate's estate. * * * Applying that rule, which seems to be universal, to the instant case, we are of the opinion that the purchase of the legacies owing to the plaintiffs by the defendant executrix was contrary to public policy and is void." (Emphasis added)

The court also said (at 50-51):

"We do not believe that defendant intentionally and wilfully conducted the affairs of said iron works for the purpose of depressing the value of the plaintiff's legacies, but to uphold what she did do is to put within the power of a trustee so to conduct the business of his *cestuis* as to do that very thing. That thing is abhorred by the law and prohibited by public policy. *The result is just the same whether the trustee so conducted herself for the purpose of taking an unfair advantage of her cestui que trustent or whether she did it in her own interests without any intention at all to injure her cestuis que trustent.* The law prohibits a trustee from so manipulating the property of the *cestuis que trustent* as to reap profit at the latter's expense. * * * " (Emphasis added)

To the same effect, and with reference to this same statute, we held in *Young et al v. Lee et al,* 132 Or 1, 14, 271 P 994, 279 P 850, 280 P 342 (1929), that:

[29]

"* * * The application by this court of this section of our code to sets of facts somewhat similar in the cases of *Wells v. Wood,* 125 Or. 38 (263 P. 54); *Adams v. Kennard, 122 Or. 84 (253 P. 1048); Gilbert v. Branchflower,* 114 Or. 508 (231 P. 982); *Acton v. Lamberson,* 102 Or. 472 (202 P. 421, 732), will readily indicate that *the spirit as well as the letter of the statute has been observed.* * * * " (Emphasis added)

*See also Wemme v. Hurlburt,* 133 Or 460, 465-66, 289 P 372 (1930).

In *Matthews v. Taylor,* 142 Or 483, 20 P2d 806 (1933) (at 491) this court also held that

"*An executor or administrator is trustee of the heirs,* interested in an estate, or beneficiaries of the will that is being administered. [Citing cases] And *it is the duty of the trustee in dealing with beneficiaries to fully inform them in regard to the value of the property and the nature of their interest in it.* [Citing cases]" (Emphasis added)

As also held in *First Nat. Bank v. Connolly,* 172 Or 434, 489-90, 138 P2d 613, 143 P2d 243 (1943):

"* * * An administrator is a trustee both for the creditors and the beneficiaries of the estate. It is his duty towards creditors to see to it that they are paid, insofar as the assets of the estate will permit. It is his duty towards the heir, in dealing with the subject matter of his trust, to exercise the utmost good faith and to take no advantage, even the slightest, of his position. Courts of equity are chiefly concerned in supervising the relations between a trustee and the *cestui que trust* to prevent the trustee from serving his own interest at the sacrifice of the interest of his *cestui que trust.* * * * "

For these reasons, and wholly aside from the provisions of ORS 116.820 (except as a statement of public policy), we hold that just as an administrator, in

[30]

view of his fiduciary duties as a trustee, may not purchase personal property from an heir or devisee previously belonging to a decedent during the course of the administration of his estate, at least without a full disclosure of its value and of the nature of their interest in it, so also an administrator may not purchase from an heir or devisee real property previously belonging to a decedent during the course of the administration of an estate, at least without first discharging his duty as a fiduciary to inform fully the heirs or devisees not only of the value of the property, but of the nature of their interest in it.

■ It follows, in our judgment, that for these same reasons an administrator may also not acquire title to such real property by a claim of adverse possession during the period of the performance of his duties as an administrator of a decedent's estate, at least without first fully informing the heirs of its value and of the nature of their interest in such lands. To hold otherwise would, in our opinion, put it within the power of an administrator to take unfair advantage of the heirs of the decedent to whom he owes a duty "to exercise the utmost good faith and to take no advantage, even the slightest, of his position."

As stated by the Texas Court of Civil Appeals in *Rayburn v. Harrison*, 269 SW2d 487, 490 (Tex 1954), although based upon a statute similar to ORS 116.820, rather than upon the fiduciary duties of an administrator:

> "* * * Since it is clearly the public policy of this state that an administrator shall not be permitted to acquire title to the property of the estate he represents by purchase, we think it must necessarily follow that it would be against the public policy of the state to permit him to acquire title to the property of the estate he represents during the administration by adverse possession. Every reason that we can think of that would prohibit such acquisition by purchase we think is equally applicable to the acquisition by adverse possession. * * * "

[31]

■ In this case, as in *Wells,* we do not believe that plaintiff intentionally conducted the affairs of the estate of her deceased husband in such a manner as to wilfully deprive her son, the defendant, of his interest in any property belonging to his stepfather at the time of his death. It also appears that defendant knew that his mother, the administratrix of his father's estate, claimed to own the ranch lands in dispute. He was not informed until 1975, however, of the fact that title to all of these lands had not been held in the name of his father and mother as husband and wife in a tenancy by the entirety so as to go directly to her as the survivor, but that title to the lands now in dispute had been held in the name of his father, so as to go to him as the heir of his father under the laws of intestate succession as they existed in 1964.[3]

■ It may be that during the time that plaintiff was the administratrix of the estate she also was not aware of those facts due to the mistake made by the title company which issued the title policy in 1961. Those facts were then a matter of record, however, and as between the plaintiff (who, as administratrix was required to perform the duties of a fiduciary on behalf of the defendant) and the defendant (who was entitled to the discharge of those duties on his behalf) we hold that any loss resulting from ignorance or mistake relating to those facts must fall upon the plaintiff, rather than upon the defendant.

For all of these reasons we hold that for the two-year period from 1964 to 1966, during which plaintiff was the administratrix of the estate of her deceased husband, plaintiff cannot claim to have held by adverse possession any of the lands belonging to her husband at the time of his death in 1964. It follows that at the time of the filing of her complaint in this case in 1975 the plaintiff could not have held possession of such lands adversely to the defendant for a

---

[3] ORS 111.020(1), repealed by 1969 Or Laws, ch 591, § 305.

period of 10 years after his death, as required for her to acquire title to such lands by adverse possession.[4]

*Adverse possession prior to death of husband—constructive or resulting trust.*

As previously stated, plaintiff's complaint alleged, as a second cause of suit, that she contributed equally with her husband to the purchase of the lands in dispute acquired after 1939; that her husband had represented and agreed to put the title to such lands in their joint names, and that his failure to do so would result in an unjust enrichment of the defendant. As also previously stated, the trial court held that a constructive trust was established in favor of plaintiff under which she was entitled to claim complete ownership of such lands.

In her brief as a respondent on this appeal plaintiff makes no attempt to sustain that holding by the trial court against the heavy attack made upon it by defendant in his brief other than to contend that she and her husband were equal partners in the operation of the ranch; that the money that purchased the lands in dispute all came from the partnership or from money inherited by her; that she and her husband had an agreement that such lands would be owned jointly, with right of survivorship, and that, as a result, a constructive trust should be imposed.

Plaintiff does not demonstrate, however, by the citation of any authority or otherwise, how a theory of constructive trust can be applied to the facts in this case to sustain her position that she is not only entitled to protection to the extent of contributions made by her to the purchase of the lands in dispute or to the

---

[4] In view of the basis on which we decide this case we need not consider whether there was an "ouster" or "notice of repudiation" of such a nature as to satisfy requirements for a claim of adverse possession by one co-tenant against another of land held by them as tenants in common. *See Wheeler v. Taylor*, 32 Or 421, 425-26, 52 P 183 (1898), and *Smith et al v. Tremaine et ux*, 221 Or 33, 36, 37, 350 P2d 180 (1960). *See also Nedry v. Morgan*, 284 Or 65, 68, 584 P2d 1381 (1978).

extent of her interest as a partner (so as to prevent the unjust enrichment of the defendant to that extent) but that she is the sole owner of such lands, free and clear of any interest of her deceased husband and of the defendant as his heir.[5] Neither does plaintiff attempt to contend on this appeal that she is entitled to prevail as an independent basis for recovery on a theory of an oral agreement to make a will or to put title to the property in the joint names of the parties.[6]

Instead, plaintiff contends that this court, by its decision in this case, should "set an exciting and sound precedent" that "a wife can claim by adverse possession (initiated by a parol gift) a Tenancy by the Entirety interest in land in her husband's name." In support of this novel theory plaintiff contends: (1) that "both parties intended joint ownership" and "believed that this was what they had accomplished;" (2) that a "parol gift," which can provide a basis for a claim of adverse possession, was established by the evidence that there was a "joint operation of the ranch," with "tax records in their joint names," "Metsker Maps in joint names," "title insurance policies in joint names," "assessor's records in joint names" and "joint payment for land and joint liability on debts"; (3) that these facts established "color of title" for the purpose of adverse possession; (4) that plaintiff paid the taxes on the property in dispute, a further indicia of a claim of ownership; (5) that one who holds possession through a mistaken belief that he has the record title

---

[5] An added complication to the imposition of a constructive trust arises from the fact that her husband's undivided one-half interest in the original ranch was acquired by him from his parents prior to his marriage to plaintiff in 1959.

[6] It may be that the reason that plaintiff does not pursue such a theory of recovery in her brief as respondent as an independent basis for recovery is that she is unable to respond to defendant's contentions to the effect that plaintiff is unable to demonstrate part performance by conduct referable solely to such an alleged agreement, as necessary to take such an oral agreement "out from under" the Statute of Frauds, and that plaintiff is also unable to demonstrate the "corroboration" of such an alleged agreement by independent evidence to the extent required to sustain recovery based upon such an alleged oral agreement.

may claim ownership by adverse possession, and (6) that "common sense" and "justice" require such a result.

Plaintiff has not demonstrated how, under such a theory of adverse possession based upon an alleged parol gift, the basic requirement that in order to acquire title by adverse possession, the possession of the claimant must be adverse or hostile to that of the true owner (her husband, in this case) is satisfied under the facts of this case. Plaintiff cites cases of adverse possession based upon parol gifts. *Miller v. Conley*, 96 Or 413, 190 P 301 (1920), and *Parrish v. Minturn*, 234 Or 475, 382 P2d 861 (1963).

In *Miller* the court appeared to rely, at least in part, upon the fact that the grantee of the parol gift in that case had "exclusive occupancy." *Parrish* held that the evidence in that case was not sufficiently strong to show an intention to transfer "entire ownership" instead of a gift of a life estate.

Plaintiff has cited no case holding that a parol gift can provide a basis for a claim of adverse possession when both parties continue to occupy the premises. In addition, as noted in *Parrish* (at 479), where a family relationship is involved, the courts are especially reluctant to find that adverse title arose from the continued occupancy and use of the property by the grantor after the alleged conveyance.

The trial court in this case held that there was not a "sufficient evidentiary showing to warrant a legal conclusion that adverse possession would run in this suit in favor of the Plaintiff from the time of the alleged parol gift [in 1950] * * *." After reviewing the record, we agree with that finding and conclusion.

We may also agree with plaintiff that the result in this case is unfortunate. It may be that plaintiff would have been entitled to partial relief had she limited her claim to the imposition of a constructive trust to provide her with protection to the extent of her

[35]

contributions to the purchase price of the lands in dispute, as compared with the contributions made by her husband. Plaintiff did not, however, offer evidence sufficient to enable this court to make such a determination, other than evidence that she worked on the ranch with her husband; that the lands in dispute (with the exception of her husband's one-half interest in the original ranch) were purchased with money earned as a result of the operation of the ranch by plaintiff and her husband; that she was given some cattle by her parents which were added to the cattle on the ranch, and that in 1963 she inherited money, some of which may have been used to make some payments on one tract of land. The problem is further complicated by the fact that her husband contributed not only his labor to the operation of the ranch, but also had contributed as capital the undivided one-half interest in the original ranch, which had been deeded to him and his brother prior to his marriage to plaintiff, who now claims to be the sole owner of that original ranch, as well as of all subsequently purchased lands.

It would appear, however, perhaps because of such problems, that plaintiff chose deliberately not to pursue a trust theory as a basis for partial recovery, but chose instead to contend that she is the sole owner of all of the disputed real property, based primarily upon contentions of adverse possession which cannot be sustained, for reasons previously stated.

It follows that the decree of the trial court must be reversed and that this case must be remanded to the trial court for further proceedings consistent with this opinion. Under the circumstances, no costs will be awarded to either party.

**LENT, J.**, concurring in part; dissenting in part.

I agree with the majority in the disposition of the claims of the plaintiff with respect to imposition of a constructive trust and her theory of parol gift-adverse possession prior to the death of her husband.

[36]

I do not agree with the majority concerning the disposition of her claim of adverse possession of the subject property following the death of her husband. The majority holds that she is not entitled to count the period of time during which she was administratrix of his estate because of the nature of the relationship between an administratrix and the heirs of a decedent and the sound public policy reasons underlying the rules of law which havefdeveloped with respect to the rights and duties arising out of that relationship. If that were the proper point of departure for analysis of plaintiff's claim and supporting evidence, I would unhesitatingly agree with the majority despite the fact that the result would be unfortunate. I believe, however, that the point of departure for analysis of these facts and this claim lies elsewhere.

The focus should be on the capacity in which she held possession. Until the time of her husband's death, plaintiff was in possession with her husband of the subject property. Their possession was under his legal title. Their joint (or common) possession was exclusive as against the whole world and no one disputed their right to that possession. Upon the death of her husband plaintiff merely *continued in possession* of the subject property *in her individual capacity,* at no time did she ever take, or purport to take, possession of any of the subject realty *in her capacity as administratrix.* Were there any evidence she had at any time grounded her claim to right of possession upon her office of administratrix, the majority's position would be unassailable, but such is not the case.

During the period of administration she possessed all of the property formerly possessed by her and her husband. After his death, however, she possessed a portion of the entire property as surviving tenant of the tenancy by the entirety created by the relevant deeds. She possessed the subject property under a claim of right arising out of her justifiable belief that all of their property had been held as tenants

[37]

with right of survivorship. That she was, also, administratrix of his estate in these circumstances was a mere happenstance. Had someone else been administrator the record yet supports the conclusion that probate would have proceeded no differently in salient matters than it actually did, and she would have obviously been in possession in her individual capacity holding adversely to the whole world. I iterate that at no time did she ever take or hold possession as administratrix.

Were my position adopted by the court, it might be necessary to address co-tenant problems to which reference is made in footnote 4 of the majority opinion. On the other hand it might not in light of the record which was made in this case. If it were necessary to address those matters, the task would be complicated not only by the state of the record but by the fact that in 1964 at the time of the husband's death the widow's statutory right of dower and the matter of admeasurement or assignment of dower would become another complicating factor.[1] I shall not address those problems in this separate opinion, however, for it would be an exercise for naught.

I respectfully dissent in this one particular.

-------

[1] In 1964 ORS ch 113 provided for widow's dower (life estate) as to one-half of all the land "whereof her husband was seized of an estate of inheritance" unless she was lawfully barred. The statutes provided, also, for admeasurement or assignment of dower; that is, to set off dower by metes and bounds "when it can be done without injury to the whole estate." There were substitute provisions for property incapable of division that made the widow a tenant in common "with the other owners of the estate" of the rents, issues and profits of the realty.